IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 2, 2008

**COREY MOTEN v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-07148      John T. Fowlkes, Jr. , Judge**

---

**No. W2008-00451-CCA-R3-PC  - Filed April 2, 2009**

---

The petitioner, Corey Moten, appeals the post-conviction court's denial of his petition for post-conviction relief.  On appeal, he argues that he received the ineffective assistance of counsel. Specifically, he argues that his trial counsel was ineffective in failing to challenge the suppression of his statement on the grounds that it was involuntarily given.  After a thorough review of the record and the parties' briefs, the judgment of the post-conviction court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Camille R. McMullen, JJ., joined.

Kim D. Meloni, Memphis, Tennessee, for the appellant, Corey Moten.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Rachael Newton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

Following a jury trial, the petitioner was convicted of second degree  murder.  Thereafter, he was sentenced as a violent offender to twenty-two years in confinement.  On appeal, this court affirmed the petitioner's conviction and sentence.  *State v. Corey Moten*, No. W2004-02896-CCA-R3-CD, 2006 WL 211827 (Tenn. Crim. App., at Jackson, Jan. 26, 2006), *perm. app. denied* (Tenn. May 30, 2006).  The following is a recitation of the convicting evidence set forth in this court's opinion on direct appeal:

At the defendant's August 2-4, 2004, trial, Maria Gauntlett, the victim's sister, testified that the victim was thirty-one years old at the time of her death and had been married to the defendant between five and seven years.

Officer Tim Monistere testified that he responded to a "wounded party" call sometime after midnight on February 2, 2001, at the residence of the defendant and the victim in Shelby County. Emergency medical personnel advised Monistere that the victim, Orchid Moten, was dead. The defendant, who appeared "pretty calm and quiet acting," told Monistere that he had arrived home from work around 12:44 a.m., found the victim with a wound to her neck in the laundry room, and called the police. Officer Monistere described the victim's appearance: "[S]he was laying [sic] on her back on the floor. There was blood around her head. And there was a towel like over her head and neck area. Her pants were completely off except for one portion of the pants and her shirt was like torn off of her. It was kind of partially hanging on her."

Sergeant Mark Rewalt testified that he made photographs and collected evidence at the crime scene. He identified a diagram he had made of the scene, as well as photographs of various items, including a "turned-over" curio cabinet, a bloody nylon rope, a short telephone cord with connectors on both ends, a set of keys, the kitchen window mini blinds found lying in the sink, and a green Army jacket. Sergeant Rewalt found two cords coming out of the telephone: one that was cut or torn that ran down to the dining room and another one that ran "along to the living room and it's connected to another extension and going into a wall." He said that "utensils used to smoke crack along with a cigarette lighter" were found in the dryer and that bloodstains were found only in the laundry room.

Lieutenant Vennes Owens testified that when [s]he arrived at the crime scene between 2:00 and 3:00 a.m., the defendant told h[er] he "had come home from work and found his wife in the back of the house dead." Lieutenant Owens observed "a lot of disarray" inside the house. The defendant subsequently was taken to the police station where he signed a waiver of rights and a consent form to search his residence. The case was assigned to Sergeant Ashton, and Lieutenant Owens and Sergeant Shemwell returned to the crime scene where they "identified all the knives in the house and left them there" and collected a sponge.

Captain James L. Fitzpatrick testified that Sergeant William Ashton was the case coordinator but was unavailable to testify because he was currently on active duty in the United States Coast Guard Reserves. Captain Fitzpatrick said he participated in the interview of the defendant which began around 11:45 a.m. on February 2, 2001. Fitzpatrick knew that the defendant already had been advised of his rights and said that the defendant signed a waiver of rights. The defendant initially told the officers that, when he arrived home at about 12:30 a.m., the door was unlocked. He said he found his wife in the laundry room, locked his dog in a room, and called 9-1-1. The defendant also said that one of the telephones had been "jerked" from the wall.

During the interview, Sergeant Ashton received a call from Sergeant Shemwell who advised that "a little rectangular pot scrubber that had been used" to clean up blood had been found at the crime scene. Captain Fitzpatrick then confronted the defendant about the inconsistences in what he had told the officers and the evidence that had been collected. When the officers questioned the defendant about the sponge, he admitted that he had used the sponge "to clean up the blood and then had rinsed it out and had placed it in a dish which is exactly where it had been found."

Asked if the defendant later "change[d] his story," Captain Fitzpatrick replied:

> And we confronted him with them one after another breaking down the initial story that he had told. He had been calm up until a certain point and then it's almost as you see on Perry Mason. Once this information began to build up and build up and build up and then he broke down and admitted that he had been the person who had inflicted the injuries on Mrs. Moten.

The defendant's statement was reduced to writing, and the defendant signed it. In his statement, the defendant said he had "cut [the victim] with a kitchen knife," which he described as a "steak knife size" with "a brown wooden handle." Asked what had caused the altercation between him and the victim, the defendant replied:

> Well, when I got home, my neighbor next door, Buddy, told me that some people had been going in and out of the house earlier that day. When I went in, I let the dog in the house and put the dog in the room that she sleeps in. I asked her why had people been going in and out of this house and you know I don't like people in this house when I'm not here. She told me that there hadn't been nobody in this house and I told her that she was lying because Buddy had told me that he had seen people going in and out of the house. She told me that he was lying and I told her, "[Y]ea, right. I don't believe you" and I went to the bathroom to use it and she confronted me at the bathroom door when I tried to walk past and she grabbed me and I pushed her off of me and she fell into the shelf that was sitting by the bathroom door.
>
> After I pushed her I went to the kitchen. I went to get something to drink. She kept pulling on my arm and she hit me in the back of my head so I turned around and hit her in the shoulder. She swung at me and she missed and then I grabbed her and grabbed the cord on the kitchen counter and wrapped it around her neck. Then I pulled open the kitchen drawer and grabbed the kitchen knife. She started pulling away from me after I wrapped the cord around her neck. She reached for the back door and opened it and I snatched her back and I cut her. Then she fell down and started bleeding and I walked away and came

> back and tried to clean up the blood and I cleaned the knife and put
> it back and I put the sponge back into the dish and I called 9-1-1.

The defendant admitted that he had pulled the victim's pants off "[t]o make it look like somebody else did it." He acknowledged that he had "knocked" the blinds off the wall in the kitchen when he put the sponge back. The defendant said that he had not wanted to kill the victim because he loved her and that he "just snapped." Captain Fitzpatrick said the defendant never indicated that he had killed the victim in self-defense or that he had been injured during the altercation. Fitzpatrick acknowledged that the defendant had been awake for at least eighteen hours at the time he gave his statement.

Lieutenant Robert Shemwell testified that he and Sergeant Vennes Owens were instructed to search for bloody clothing at the crime scene. Although they did not find any bloody clothing, they found a wet sponge with the "same width of the pattern of blood smear pattern that was beside the [victim's] body on the floor." Shemwell placed the sponge beside the blood smear on the floor and took a photograph for comparison purposes. He then took the sponge to the homicide office where he showed it to Sergeant Ashton. After he learned that the defendant had confessed to killing the victim, Lieutenant Shemwell returned to the crime scene to "locate a knife that was possibly used in the murder." The officers had received information that the murder weapon was "a serrated edge knife, like a steak knife with a wooden handle." Photographs were made of several knives found in a drawer and one was collected as evidence. Sergeant Ashton later showed the collected knife to the defendant who verified that it was the knife he had used to kill the victim.

Dr. Jennifer Love, a forensic anthropologist at the Regional Forensic Center of Memphis who was accepted by the court as an expert in the field of forensic anthropology, testified that she had reviewed the victim's autopsy report and had examined a forensic cast made of the cartilage from the victim's neck region. She made sample cut marks with the suspect knife, compared them to the castings made of the cartilage of the victim's neck, and opined that the knife was "consistent with the knife that was used in terms of the serrations." However, she could not determine if the knife was the actual murder weapon.

Dr. O'Brian Cleary Smith testified that he performed the autopsy on the victim's body on February 2, 2001, which revealed the presence of alcohol and cocaine in her system. He said the victim died "as a result of both ligature strangulation and cutting of the neck. Specifically with the ligature strangulation there's a mark left on the skin at the front surface of the neck that is consistent with a narrow cord that measures about one tenth of an inch." He described the cuts to the victim's neck:

> In the front portion of the neck there was a series of wounds about
> five and three quarter inches in length across the front. And it was not
> a single wound but it was a confluence of at least three wounds in

which there were-you could tell where a wound would start and then another wound would begin within that wound and it would leave a jagged edge or margin to the wound indicating that about three or a minium of three passes of the knife were required to produce a wound of this type. There were two small superficial abrasions where the cutting surface of the knife barely touched the skin. It was just enough to cut through the very top layers. Those were in line with two of the other two cuts. So I think with a fair degree of medical competence and certainty at a minium of three passes of the knife would have been required to produce the injuries to the neck. Those injuries went down deep enough to cut through the two heavy muscles on either side of the neck . . . . In so doing the knife went through both of the jugular veins, the external jugular veins. . . . [T]he knife proceeded through the windpipe and the voice box cutting it almost to the rear wall of the windpipe leaving tool marks present in the cartilage of those tissues.

Asked which injury caused the victim's death, Dr. Smith opined that either the knife wounds or the strangulation could have been lethal and said that each injury occurred while the victim was still alive. He agreed that a cut to the victim could have begun while she was standing but said she "did not have the extensive damage to her neck done while she was standing up."

*Id*. at *1-4.

On August 11, 2006, the petitioner timely filed a petition for post-conviction relief. Thereafter, post-conviction counsel was appointed, an amended petition was filed, and an evidentiary hearing was held. At the hearing, the petitioner testified that his trial counsel represented him at trial and on appeal. He recalled that he hired counsel around February 2001 and his case went to trial in August 2004. According to the petitioner, he communicated with counsel about eight to ten times during counsel's representation, including three to five meetings at the jail. The petitioner recalled that he and counsel had lengthy conversations about his case. However, he claimed that counsel did not demonstrate enthusiasm for the case and would sometimes "nod off" during meetings.

The petitioner testified that he and counsel discussed defense strategies. The petitioner said he kept urging counsel to find a way to prove his innocence. The petitioner also told counsel that he wanted to testify at trial. Counsel told the petitioner that this strategy would not work because of the petitioner's statement to police. Counsel advised the petitioner that they should pursue a strategy that the petitioner acted in the "heat of passion" in order to persuade the jury to find the petitioner guilty of voluntary manslaughter. The petitioner complained that when he voiced his opinion, counsel would get upset, use vulgar language, and act unprofessionally.

The petitioner testified that counsel filed a generic motion to suppress the petitioner's statement to police, alleging that the petitioner was not properly *Mirandized*. The petitioner recalled that the trial court denied the motion to suppress on this basis. The petitioner acknowledged that the

-5-

police officers informed him of his *Miranda* rights and that he signed at least two waivers of his *Miranda* rights before giving his statement to police. However, the petitioner asserted that counsel should have made an effort to pursue the suppression of his statement to police due to the circumstances under which it was given. The petitioner explained that he originally professed his innocence of the murder but later confessed because he was afraid. The petitioner said that while in custody, he was interviewed by a number of different police officers and some of them ranted and raved at him. The petitioner said that one of the officers told him that if he confessed he would get twenty-five years confinement, but if he did not confess he would receive a life sentence. The petitioner claimed he confessed because he was kept in a small cell with no windows, had little sleep, and had nothing to eat except a Coke and some crackers.

The petitioner admitted that he reviewed the original motion to suppress with counsel. The petitioner said he did not ask counsel to file another motion to suppress because counsel told him that it would not work. The petitioner said that he filed a pro se motion to suppress but did not receive a response from the state or a hearing by the court. The petitioner said that there was no physical evidence or witness testimony which tied him to the murder.

The petitioner testified that he discussed with counsel the possibility of presenting an alibi defense. He asserted that he gave counsel a list of ten to fifteen potential witnesses but he was unaware if counsel ever contacted any of them. The petitioner noted that counsel filed a notice of alibi. The petitioner complained that counsel failed to adequately investigate his case and communicate with him. However, counsel said that he did not attempt to obtain new counsel because he did not know how and could not afford another attorney.

Trial counsel testified that he had practiced law for over forty years and had handled a number of murder cases. He said that he began representing the petitioner about two and one-half years before the petitioner's trial. Counsel estimated that he met with the petitioner five to seven times at the jail and had numerous conversations with the petitioner about the case. He discussed possible defense strategies with the petitioner. He recounted that the petitioner wanted to pursue a strategy that he did not have enough time to commit the murder. Counsel recalled, however, that he was unable to find any witnesses who could corroborate the petitioner's defense strategy. In addition, the petitioner gave a statement to police wherein he admitted that he murdered his wife and told police where to find the knife he used to cut his wife's throat. Counsel also noted that there was a good amount of forensic evidence which supported the petitioner's statement.

Counsel acknowledged that he argued with the petitioner over the motion to suppress. He recalled that the petitioner would occasionally profess that he did not make a statement to police and counsel would have to remind the petitioner that he had signed the statement. Counsel said that he discussed the defense strategy that the petitioner killed his wife in a state of passion produced by adequate provocation. He said that the petitioner eventually agreed with him that arguing adequate provocation was the only viable option given the evidence.

Counsel acknowledged that he could have argued the petitioner was sleep-deprived when he confessed to police. Counsel noted, however, that it was better to have the statement introduced at trial than have the petitioner testify. He explained that the statement indicated that the petitioner's

wife had been entertaining men at their house while the petitioner was at work. As such, the strategy was to establish adequate provocation in effort to persuade the jury to find the petitioner guilty of voluntary manslaughter rather than second degree murder. Counsel stated that without the introduction of the statement at trial, he could not have argued voluntary manslaughter.

Counsel testified that he advised the petitioner not to testify because he would be subject to cross-examination. Counsel recalled that the petitioner initially insisted on testifying, but he changed his mind prior to trial. Counsel said that even if the statement had been suppressed, it would likely have come in during cross-examination to impeach the petitioner's testimony.

The post-conviction court denied the petition for post-conviction relief by written order entered March 27, 2008. The court found *inter alia*, that the petitioner failed to establish the factual allegations contained in his petition by clear and convincing evidence. The petitioner filed a timely notice of appeal.

## ANALYSIS

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice

must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

The petitioner alleges that his trial counsel was ineffective in failing to challenge the suppression of his statement on the grounds that it was involuntarily given. Specifically, the petitioner asserts that the "boilerplate motion filed made no mention of the fact that at the time the [p]etitioner gave [i]nvestigators the inculpatory statement, he had been awake for over twenty-four hours and had been threatened or coerced by investigators."

Upon review of the record, we conclude that the petitioner failed to demonstrate he was denied the effective assistance of counsel. The petitioner's claim of deficiency is premised solely on his allegation that counsel failed to file a motion to suppress his statement to police on the grounds that it was involuntary. However, contrary to the petitioner's allegation, trial counsel testified that the best defense strategy in the petitioner's case was to argue the petitioner killed his wife in a state of passion produced by adequate provocation. Counsel stated that without the introduction of the statement at trial, he could not have argued voluntary manslaughter. Counsel noted that this defense strategy was discussed with the petitioner. As such, counsel made a reasonable strategic decision based upon adequate preparation and investigation. Moreover, the petitioner failed to prove the factual allegation that his statement was involuntarily given. Contrary to his allegation, the petitioner admitted at the evidentiary hearing that he was read his rights and signed at least two different waivers prior to giving his statement. The petitioner did not present any evidence at the hearing to corroborate his allegation that he was deprived of sleep, hungry, and coerced by police. Additionally, the petitioner failed to establish that these alleged circumstances affected the voluntariness of his statement. Accordingly, the petitioner is not entitled to relief on this issue.

## CONCLUSION

The petitioner has failed to meet his burden of proof regarding his claims of ineffective assistance of counsel and the post-conviction court correctly denied the petition. Therefore, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE

-8-